IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

KEONNA YANTIZE WILLIAMS                                                                    PLAINTIFF

v.                                        Civil No. 08-5144

SHERIFF KEITH FERGUSON;
CAPTAIN HUNTER PETRAY;
and LT. CARTER                                                                             DEFENDANTS

### REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

The Plaintiff, Keonna Yantize Williams (hereinafter Williams), filed this civil rights action pursuant to 42 U.S.C. § 1983. He proceeds *pro se* and *in forma pauperis*.

Williams is currently an inmate of the Arkansas Department of Correction (ADC). In this action, Williams contends his constitutional rights were violated while he was incarcerated in the Benton County Detention Center from September 24, 2007, until his transfer to the ADC on June 11, 2008. Specifically, he contends he was placed in administrative segregation as punishment because he is a pre-operative transsexual with breast implants.

Defendants filed a supplemental summary judgment motion (Doc. 38). To assist Williams in responding to the summary judgment motion, a questionnaire was propounded (Doc. 47) by the Court. Williams filed a response to the questionnaire (Doc. 53). The motion is now ready for decision.

### Background

On September 24, 2007, Williams was booked into the Benton County Detention Center (BCDC). *Defendants' Exhibit* (hereinafter *Deft's Ex.*) 1. Williams was a pretrial detainee until May 19, 2008. Doc. 37 at pg. 7. He was transferred to the ADC on June 11, 2008. *Defts' Ex.* 1; *Plaintiff's Response* (hereinafter *Resp.*) Doc. 53 at ¶ 1.

Williams was placed in administrative segregation. According to Lieutenant Carter, Williams was segregated from other inmates to protect him from a foreseeable risk of sexual abuse or assault due to his unique physical characteristics as a pre-operative transsexual. *See* Doc. 40 at ¶ 3. An administrative segregation action form dated November 7, 2007, indicates Williams was segregated because of his breast implants and for his safety. *Plaintiff's Exhibit* (hereinafter *Plff's Ex.*) 1. It was noted that other inmates had been witnessed staring at Williams and watching him with contempt. *Id.* The form indicates the decision was reviewed on November 30, 2007, January 16, 2008, February 8th, February 29th, and April 17th. *Id.*

According to Carter, other than Williams, between 2006 and 2008, there were no known: (1) transsexual inmates; (2) inmates who had undergone hormone therapy; or (3) male inmates with breast implants housed in the BCDC. Doc. 40 at ¶ 4.

Williams maintains there were other transsexuals in the BCDC in these years with the same characteristics he possessed who were housed in general population. *Resp.* at ¶¶ 2 & 3(A). He indicates he was told this by Officer Richie and Sergeant Lisingby. *Id.* at ¶ 2. By affidavit, Vernechia Williams states she spoke with Lisingby concerning the "placement of my daughter, Keonna Williams, in the Benton County Jail." *Resp.* at pg. 14. Vernechia Williams further indicates Lisingby stated "there had been other pre-op transsexuals at the jail prior to my daughter's arrest that [were] housed in general population." *Id.*

Williams points out that even without breast implants, pre-operative transsexuals have breasts as the result of hormone therapy. *Id.* at ¶¶ 3(A) & 3(C). Further, even while on administrative segregation, he indicates there were times when he had contact with other inmates

without officer protection. *Id.* at ¶ (2). For instance, when he was taken to court or while he was out of his cell for recreation. *Id.*

Inmate Paul Allen is the only individual identified by Williams as a similarly situated inmate who was treated differently. *Resp.* at ¶¶ 3(A) & 6. Allen was incarcerated at the BCDC from April 3, 2006, to April 8, 2006. *Defts' Ex.* 3 pg. 1; *Resp.* at ¶ 4(A). He was housed in general population in D-130. *Defts' Ex.* 3 pg. 1; *Resp.* at ¶ 4(B). During this incarceration, Lieutenant Carter asserts that Defendants had no knowledge Allen was a transsexual, had undergone hormone therapy, or had breast implants. *See* Doc. 40 at ¶ 6. Williams, however, states that Allen's booking photographs from 2006[1] "will plainly show that Paul Allen didn't show any signs of being a male. Natural long hair, full-figured body, and breast[s] from hormone therapy." *Resp.* at ¶ 4(C). Because Allen was housed in general population, Williams believes he should have been housed in general population as well. *Id.*

Allen was again incarcerated at the BCDC from February 8, 2008, to March 3, 2008. *Defts' Ex.* 2; *Resp.* at ¶ 5(A). According to Lieutenant Carter, during this incarceration, Defendants had knowledge that Allen was a "transvestite" and "acted like a female." Doc. 40 at ¶ 9. Williams maintains a transvestite is a "male who dresses in drag" while Allen lives his day to day life as a female. *Resp.* at ¶ 5(C). Therefore, Williams maintains Allen is properly classified as a transsexual. *Id.*

From February 8th to February 11th, Allen was housed in general population in D-130. *Defts' Ex.* 3 at pg. 2; *Resp.* at ¶ 5(D). On February 11th, apparently in response to a grievance Allen

---

[1] The Court was not provided Allen's booking photograph from 2006. The Court, however, was provided with a copy of the February 8, 2008, booking report that includes a booking photograph. *Defts' Ex.* 2. The copy provided is dark and it is not easy to discern the facial features. *Id.* Allen appears to either have short hair or his hair, if long, is pulled back rather severely.

submitted, and at his request, he was moved to administrative segregation in E-102. *Defts' Ex.* 3 at pg. 2*; Defts' Ex.* 5; *Resp.* at ¶ 5(E). He remained in administrative segregation until released from the BCDC on March 3, 2008. *Defts' Ex.* 2; *Defts' Ex.* 3 pg. 2.

On February 20, 2008, Sergeant Torres prepared a report involving an incident reported by Allen on February 8th.[2] *Defts' Ex.* 4 at pg. 1; *Resp.* at ¶ 5(I). Allen indicated one of the inmates in D-130 had bent him over and spanked or slapped him on the butt. *Defts' Ex.* 4 pg. 1*; Defts' Ex.* 5. Allen either could not, or would not, identify the inmate involved. *Defts' Ex.* 4 at pg. 1. Allen asked to be placed in protective custody. *Id.* His request was initially refused because the inmate involved was not identified and there was no past history of harm occurring to homosexual inmates. *Id.* When told this, "Allen replied that he was not homosexual" and used a term not known to Torres in referring to himself. *Id.* Williams believes the term was transsexual. *Resp.* at ¶ 5(I).

On February 13, 2008, Lieutenant Carter was assigned to investigate a grievance filed by Allen on February 8th. *Defts' Ex.* 4 pg. 2; *Resp.* at ¶ 5(J). Allen stated he had been bent over a table and slapped on the butt. *Id.* He indicated there was "whistling, touching . . . cat calling" and "kissing sounds." *Defts' Ex.* 5. He stated it was "gross" and "uncalled for." *Id.* Allen asked to be moved. *Id.*

When Carter began his investigation, Allen identified another inmate, Gary Finnell, as a witness. *Defts' Ex.* 4 pg. 2. Allen identified the individual involved as Levi Guenther. *Id.* Finnell corroborated the incident but would not identify the other inmate involved. *Id.* Finnell stated the

---

[2] The report actually indicates the incident occurred on February 7, 2008. *Defts' Ex.* 4 pg. 1. However, Allen was not booked in until February 8, 2008. *Defts' Ex.* 2. An incident report prepared by Carter indicates the incident occurred on February 8th. *Defts' Ex.* 4 pg. 2. Additionally, a grievance submitted by Allen contains the February 8th date. *Defts' Ex.* 5.

incident was harmless, meant as a "punk out,"[3] and was done because Allen acts like a female. *Id.* When Carter spoke to Guenther on March 13th, he had already been released. *Id.* Guenther denied all allegations. *Id.* Carter concluded that further investigation was unfounded due to lack of evidence. *Id.*

Williams was asked to explain in detail how he believes he was treated differently than other inmates with the same physical characteristics. *Resp.* at ¶ 7. He indicates he was never given an opportunity to be housed in general population. *Id.* As a result of being housed in administrative segregation, Williams states he was denied privileges given to other inmates such as the opportunity to use a telephone in the evening or an opportunity to become a trustee. *Plff's Ex.* 2.

Williams also maintains he was entitled to a hearing before he was placed in segregation. *Resp.* at ¶ 7. Williams believes the administrative segregation action form is fabricated. *Plff's Ex.* 1. He states he was never aware of any administrative reviews and should have been given an opportunity to speak on his own behalf. *Id.*

## Summary Judgment Standard

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986), the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue

---

[3] According to the Urban Dictionary, "punk out" means "[t]o be intimidated to the point of retreat." http://www.urbandictionary.com (accessed January 10, 2011).

of material fact exists." National Bank of Commerce v. Dow Chemical Co., 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. "They must show there is sufficient evidence to support a . . . verdict in their favor." National Bank, 165 F.3d at 607 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." Id. (citing Metge v. Baehler, 762 F.2d 621, 625 (8th Cir. 1985)).

**Discussion**

On March 3, 2010 (Doc. 37), a report and recommendation was entered recommending that Defendants be granted summary judgment on several of Williams' claims. It was also recommended that Defendants be directed to file a supplemental summary judgment motion addressing specified issues. The report and recommendation was adopted (Doc. 41).

Defendants have now filed their supplemental motion for summary judgment. Defendants argue Williams was placed in administrative segregation for permissible non-punitive reasons. Further, they maintain there have been no other transsexuals treated differently.

Here, Williams was a pretrial detainee until May 19, 2008. As such, the Due Process Clause is applicable to his claim. Bell v. Wolfish, 441 U.S. 520, 535 (1979). "In evaluating the constitutionality of conditions or restrictions of pretrial detention . . . the proper inquiry is whether those conditions amount to punishment." Id. A right to Due Process exists if the detainee demonstrates: (1) an expressed intent to punish on the part of detention facility officials; or (2) that the challenged condition or restriction lacked a reasonable relationship to legitimate, nonpunitive

administrative purpose. Id., at 538-39. It is well recognized that "[t]he Government has legitimate interests that stem from its need to manage the facility in which the individual is detained." Smith v. Copeland, 87 F.3d 265, 268 (8th Cir. 1996)(citations omitted).

I conclude there is no genuine issue of material fact as to whether Defendants expressly intended to punish Williams. Williams has pointed to no indications of express intent to punish as reflected in any statements made by Defendants or as reflected in the record in anyway.

Absent proof of an express intent to punish, there must be a genuine issue of material fact as to whether Williams' placement in administrative segregation was arbitrary or not reasonably related to a legitimate, non-punitive, administrative purpose. Bell, 441 U.S. at 538-39. "An action may be reasonably related to a legitimate governmental purpose if an alternative purpose to which the act may rationally be connected is assignable for it and the action does not appear excessive in relation to the alternative purpose assigned." Robles v. Prince George's County, Maryland, 302 F.3d 262, 269 (4th Cir. 2002)(internal citations and punctuation omitted); see also Valdez v. Rosenbaum, 302 F.3d 1039, 1046 (9th Cir. 2002)("A reasonable relationship between the governmental interest and the challenged restriction does not require an "exact fit," nor does it require showing a "least restrictive alternative"); Higgs v. Carver, 286 F.3d 437 (7th Cir. 2002)("no process is required if he is placed in segregation to protect himself from other prisoners); Martinez v. Turner, 977 F.2d 421, 423 (8th Cir. 1992)("Requiring a pretrial detainee to work or be placed in administrative segregation is punishment. . . . Regardless of whether the detentions are classified as 'administrative,' if a pretrial detainee must remain in a lock-up area if he does not work, the detention amounts to punishment.").

The issue then is whether there is a reasonable relationship between Williams being placed in "administrative segregation" and a legitimate government interest. Restraints that "are reasonably related to the institution's interest in maintaining jail security do not, without more, constitute unconstitutional punishment, even if they are discomforting." Bell, 441 U.S. at 540.

Defendants are not precluded by the Constitution from considering Williams' transsexual status in determining his housing assignment. In fact, had Defendants not considered protective measures based on Williams' unique characteristics and assigned him to segregated housing, they may well have been faced with a claim that they had violated his constitutional rights by failing to protect him or by subjecting him to unconstitutional conditions of confinement. See e.g., Farmer v. Brennan, 511 U.S. 825 (1994)(*Bivens* action brought by a transsexual who was raped, claiming the prison officials showed deliberate indifference by placing prisoner in the general prison population); Greene v. Bowles, 361 F.3d 290, 293-294 (6th Cir. 2004)(Greene was a male-to-female transsexual. "[E]vidence was presented from which a trier of fact could conclude that Greene was vulnerable, not just to sexual assault, but also to physical assaults by her fellow inmates, such that her presence in the [Protective Custody Unit] with other inmates without segregation or protective measures presented a substantial risk to her safety of which Warden Brigano was aware."); Meriwether v. Faulkner, 821 F.2d 408, 417 (7th Cir. 1987)(Plaintiff was a male-to-female pre-operative transsexual. No claim may be maintained under the Due Process Clause. Recognizing that given Plaintiff's "transsexual identity and unique physical characteristics, her being housed among male inmates in a general population cell would undoubtedly create . . . a volatile and explosive situation. Under such circumstances it is unlikely that prison officials would be able to protect her from violence, sexual assault, and harassment.")(internal quotation marks and citation omitted).

Williams maintains Defendants intended to punish him by placing him in administrative segregation because of his status, a pre-operative transsexual with breast implants. Williams suggests evidence of intent to punish can be inferred from the different treatment given to Allen. I disagree. If anything, Allen's situation underscores the existence of legitimate security interests in segregating Williams. While Allen was initially placed in general population during his second stay at the BCDC, the very first day an incident occurred illustrating Allen's vulnerability to physical assault by fellow inmates. No other evidence has been presented suggesting the lack of a reasonable relationship between the placement of Williams in administrative segregation and the need to protect Williams from possible sexual assault. I conclude there is no genuine issue of material fact as to whether Defendants intended to punish Williams by placing him in administrative segregation.

## Conclusion

For the reasons stated, I recommend that Defendants' supplemental motion for summary judgment (Doc. 38) be granted and this case dismissed with prejudice.

**The parties have fourteen (14) days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

**DATED** this **13th day of January 2011.**

/s/ *Erin L. Setser*
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE